### 65399. KRAFT LAND SERVICES, INC. et al. v. HART COMPANY, INC. et al.

BANKE, Judge.

The plaintiffs, John K. Hart, Sr., and The Hart Company, Inc. (hereafter referred to together as "Hart"), filed suit against Kraft Land Services, Inc., to recover commissions allegedly earned on Kraft's sale of over 20,000 acres of timberland to J. W. Casey. The land was sold to Casey in five separate tracts as follows: 9,000 acres on June 3, 1977, for $225 per acre; 550 acres on July 25, 1977, for $150 per acre; 6,500 acres on September 27, 1977, for $115 per acre; 2,600 acres on November 11, 1977, for $125 per acre; and 2,200 acres on December 31, 1977, for $125 per acre. The plaintiffs based their claims both on breach of an alleged verbal listing agreement and on *quantum meruit.* They also sought punitive damages based on an alleged conspiracy by Kraft and unknown others to defraud them of their commissions. Kraft denied the existence of any obligation to the plaintiffs and filed a third-party complaint against the purchaser, Casey, and two of his alleged agents, William F. Spear and Forrest Long, charging them with liability based on fraudulent misrepresentation and contractual indemnity.

At trial, Kraft was awarded a directed verdict as to the fraudulent conspiracy allegation, and directed verdicts were also granted as to several counts of the third-party complaint which are not germane to this appeal. The jury then returned a verdict for the plaintiffs and against Kraft in the amount of $202,565.99 with regard to the 9,000-acre tract and $8,250 with respect to the 550-acre tract. Both these awards were based on breach of the alleged "verbal listing" agreement. The jury found in favor of Kraft as to the three remaining tracts.

A construction of the evidence in support of the verdict, reveals the following salient facts. Hart had been attempting to sell the Kraft land for several years. His activities in this regard included

advertising the land, obtaining maps and aerial photographs from Kraft and other sources, preparing and distributing informational packets which included these maps, and inviting participation by other brokers. Kraft's ownership of the land was not revealed in these packets, which advertised the sale price to be $250 per acre. Although Hart had asked Kraft on several occasions for an exclusive agency to sell the land, none was ever given him. Rather, he had merely an "open listing," meaning that if he procured an acceptable offer, Kraft would pay him a commission on the sale. In this regard, his position with respect to the offering was the same as that of any other licensed broker in the state.

Hart based his claim for commissions on his own efforts combined with the efforts of three Alabama realtors who were working with him to procure a sale. The first of these was Larry Kuka, whom Hart met towards the end of September 1976 while attending a real estate seminar in Florida, and to whom he later sent one of his information packets. On November 16, 1976, Kuka brought two prospects to meet with Hart and see the 9000-acre tract. One of these prospects was third-party defendant Spear. In response to expressions of interest by Spear, Hart "registered" him with Kraft as a prospective purchaser on December 6, 1976, along with another prospect from Alabama who has no connection with this litigation. This registration consisted of mailing to Kraft a notice containing Spear's name and requesting that, if he contacted Kraft in connection with the property, he be referred to Hart as Kraft's agent. By the time Casey made his initial purchase in June of the following year, Hart had registered 70 or more persons with Kraft in this manner, some of whom were other brokers and some of whom he did not personally know. These registration forms included no information about the prospects other than their names and occasionally their addresses.

In addition to sending Kuka one of his information packets in late 1976, Hart also sent one to Bill Crummey, a broker whose office was located in Selma, Alabama. Crummey subsequently received a telephone call from Mildred Jones, a real estate broker in Montgomery, Alabama, informing him that she had a prospect named Casey who was interested in purchasing timberland. Since Crummey had several listings of timberland, the two agreed to work together and to split their commissions on any land which they might sell to Casey. This agreement was reduced to writing in a letter from Jones to Crummey dated November 2, 1976. On November 3, 1976, Crummey met with Casey to show him some timberland north of Selma and, while doing so, told him about the Georgia land described in Hart's information packet. Casey responded that he was not

interested in buying timberland in Georgia.

Shortly after introducing Spear to Hart and showing him the 9,000-acre tract of Kraft land on November 16, Larry Kuka sent Mildred Jones one of Hart's information packets. Upon receiving this information, Jones attempted to interest Casey in the land, but Casey's response was the same as the one he had previously given Crummey, i.e., that he was not interested in buying Georgia timberland.

In early December 1976, Hart, Kuka, and Crummey showed the 9,000-acre tract to two new prospects, neither of whom have any connection with this litigation. At this time, Crummey took Hart aside to tell him that he had been requested by Mildred Jones to look for land to sell to Casey. Hart registered Crummey with Kraft on December 10, 1976. Also, in contemplation of a possible sale to Casey, he suggested to Crummey by letter dated December 13, 1976, a commission split of 40 percent to buyer's realtor (referring to Ms. Jones), 25 percent to "in-between broker," (referring to Crummey), and 35 percent to listing broker (referring to himself). At about the same time, Crummey sent one of Hart's information packets to Casey and followed up with a phone call to determine his interest in the property. Casey responded that he had been very busy and not had time to look into the matter. Both Crummey and Hart registered Casey with Kraft in late December of 1976. In February or March of 1977, Casey mistakenly telephoned Crummey believing he was calling another broker, and Crummey asked him if he had given further thought to either the Georgia land or the land north of Selma which Crummey had showed him in November of 1976. Casey replied that he had not, and this was the last discussion Crummey ever had with Casey regarding the Kraft property.

Late in December of 1976, Hart notified Kuka of a separate and unrelated tract of timberland in Stewart County, Georgia, on which he had a listing, and shortly thereafter Kuka took Spear onto this land. At this time, Spear made an offer to purchase the Stewart County land, but this offer was never accepted. Sometime in January of 1976, Casey met with Hart regarding a possible purchase of Stewart County land, and on their way to look at it, they evidently looked at a portion of the 9,000-acre tract of Kraft land. Later in January, Hart showed the Stewart County land to two agents of Casey, Forrest Long and O. C. Miller, and while driving past the Kraft land he gave each of them one of his information packets and asked if Casey might be interested in purchasing it. Their reply was that Casey wanted to complete his purchase of the Stewart County property before giving any consideration to the purchase of other Georgia timberland.

Still in pursuit of the Stewart County land, Casey came to Hart's office in February of 1977, and at this time Hart showed him some aerial photographs of the Kraft property which adorned the walls of his office and also gave him some information packets in another attempt to interest him in purchasing the property. Hart testified, however, that he stopped short of discussing terms with Casey because he had been told repeatedly by Casey's "people" to wait until the Stewart County transaction was completed before pressing him on the Kraft land. The Stewart County transaction was closed on March 2, 1977, and Hart received a commission on this sale.

It will be recalled that Hart had registered Spear as a prospective buyer of the Kraft lands on December 6, 1977. Having reason to believe that Spear was acting as Casey's agent when he inspected the Stewart County property, Hart entered into a written agreement with Kuka, following the closing of that sale, to split any commission on Kraft land sold to or through Spear. Subsequently, by letter dated March 14, 1977, Kuka registered Spear with Kraft, noting in his letter that he was acting as a "co-op broker" with Hart. Two days prior to this, unbeknownst to Hart and Kuka, Spear had contacted Kraft directly about the 9,000-acre tract, responding to a newspaper ad which Kraft had placed with reference to the land. He asked Kraft's representative, Harvey Mills, for maps and other information regarding the property, telling him that he was representing another person but that he was not a broker. According to Spear, Mills stated at this time that it was Kraft's wish to deal directly with the purchaser rather than through a broker.

According to John Daniel, a salesman in Hart's employ, Spear dropped by Hart's office in the company of Long and Miller during March of 1977 to obtain one of Hart's information packets regarding the 500-acre tract of Kraft property. Hart was not in at the time.

Larry Kuka testified that he stayed in regular contact with Spear after March of 1977 and that he brought up the subject of the Kraft property with him during almost all of these conversations. However, he stated that on each such occasion, Spear told him that Casey was not interested and then changed the subject. Kuka testified that he also brought up the subject of the Kraft property in discussions with Long and Miller during this period, but with the same results.

In May of 1977, Spear took Long and Miller onto the 9,000-acre tract of the Kraft lands to conduct an inspection on Casey's behalf. At trial, Spear testified that he did not tell Casey that he had initially been introduced to this property by Kuka and Hart because of Mills' previous statement to him that Kraft did not want any brokers

involved in the sale. After conducting their inspection, the three men brought Casey onto the land, where the four of them spent five days conducting additional inspections. Then, on May 24, immediately after finishing this 5-day tour, the four men drove to Kraft's Atlanta office, where Casey made an offer to Mills to purchase the 9,000 acres at $225 per acre. This offer was, of course, later accepted by Kraft.

At the same time that Casey and his agents were inspecting the 9,000-acre tract and preparing to make Kraft an offer for it, John Daniel, Hart's salesman, located another prospect who was willing to offer $250 per acre for the tract. When Daniel was finally able to contact Mills in mid-June to communicate this offer, Mills told him that he would run a financial check on the prospect but did not tell him that Casey had already signed a contract on the property. Daniel did not learn that the land was under contract to Casey until a few days later, on June 22. The sale of the 9,000 acres to Casey was closed on June 30, 1977.

Upon learning that Casey had contracted to purchase the land, Daniel telephoned Hart, who was on vacation, and then sent Kraft a letter dated June 22, 1977, re-affirming Hart's prior registration of Casey as a prospective purchaser. Upon receipt of this letter, Mills checked with Casey and Spear to determine whether they acknowledged any involvement by Hart or his "co-op brokers" in the sale; and, upon learning that they did not, he had them affirm this disavowal in writing. With respect to the sale of the four remaining tracts of Kraft land which Casey later purchased, Casey was required to sign agreements indemnifying Kraft against any liability for commissions.

In his brief, Hart characterizes his claim against Kraft as follows: "It is upon the basis of Hart and his co-brokers introducing and showing this land to Casey and his agents; giving them all detailed written information about it; continuing to attempt to interest them in the land up to and through the time of the sale of the first tract; their registration of Casey and his agent, Spear as a prospective purchaser with Kraft; and Kraft's intentional disregard of these registrations that plaintiff's claim they qualify as the procuring cause of the sale of all of these tracts from Kraft to Casey, and are entitled to commissions thereon." *Held:*

1. Where a property owner has authorized a broker to procure a purchaser for his property but has not given him an "exclusive agency" to do so, the owner remains free to sell the property himself or to sell it through another broker. See generally OCGA § 10-6-32 (Code Ann. § 4-213); *Wilcox v. Wilcox,* 31 Ga. App. 486 (1, 2, 3) (119 SE 445) (1923); *Sharp-Boylston Co. v. Lundeen,* 145 Ga. App. 672, 673 (244 SE2d 622) (1978). However, where the broker can show that

he was the "procuring cause" of the sale, he is entitled to a commission even though he has no exclusive agency and even though someone else may actually have consummated the sale. See generally, *Wilcox v. Wilcox,* supra; *Ideal Realty Co. v. Storch,* 124 Ga. App. 271 (2) (183 SE2d 520) (1971).

"In determining whether or not a real estate broker is the procuring cause of a sale where there is no exclusive contract to sell, the broker must show and prove that there were negotiations still pending between the broker and the prospective purchaser and that the owner was aware that negotiations were still pending at the time he consummated the sale. (Cits.)" *Gibbs v. Nixon,* 154 Ga. App. 463, 466 (268 SE2d 670) (1980). Of course, where the owner knowingly interferes with the negotiations between the purchaser and the broker, it becomes unnecessary to show negotiations were pending when the sale was consummated. See e.g., *Pate v. Milford A. Scott Real Estate Co.,* 132 Ga. App. 49 (2) (207 SE2d 567) (1974); *Spence v. Walker,* 92 Ga. App. 609 (2) (89 SE2d 668) (1955). The broker can thus make out a prima facie case by showing "that negotiations for the sale were set on foot through his efforts, that he performed every service required by his employment which it was possible to perform, and that the failure on his part to personally consummate the trade was due to the interference of the defendant." *Tomlin v. Bickerstaff,* 85 Ga. App. 48, 51-52 (68 SE2d 224) (1951); *Nestle' Co. v. J. H. Ewing & Sons,* 153 Ga. App. 328, 331 (265 SE2d 61) (1980). The term "negotiation" is defined by Black's Law Dictionary (4th Ed. Rev.) as "[t]he deliberation, discussion, or conference upon the terms of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction."

There is no evidence in the lengthy transcript before us in this case that Hart or any of his associates ever discussed terms with Casey or any of his agents with regard to a possible sale of the Kraft property, nor is there any evidence that Casey or his agents ever communicated an offer of any kind to or through Hart or his associates. Indeed, Hart admitted on cross-examination both that he had never discussed terms with Casey and that Kraft had never done anything to interfere with his efforts to sell to Casey. Thus, while it is undisputed that Hart and his associates introduced Casey and his agents to the land, gave them information about it, and repeatedly sought to interest them in purchasing it, the evidence is not sufficient to support a finding that the Hart group was the procuring cause of the sale.

In *Gibbs v. Nixon,* supra, this court affirmed a grant of summary judgment against a broker in the face of undisputed evidence that he had worked diligently for several years to sell the property and had

introduced the purchaser to it. In *Jordan v. Dolvin Realty Co.,* 54 Ga. App. 472 (188 SE 304) (1936), the broker established that he had advertised the property in question, spoken to the purchaser about it on the telephone, and shown the property to her, only to have her negotiate a contract through another broker who was her personal friend. In ruling that the evidence was insufficient to support the award of a commission, the court reasoned as follows: "If such evidence makes out a case of procuring cause, it would never be safe for an owner of property to sell through any agent, except the first one who directed the prospective purchaser to the premises; and in the event the purchaser does not wish to deal with the first agent, the owner must lose his sale, or be subjected to the payment of a dual commission. If such evidence makes a case of procuring cause, all that an agent would have to do would be to direct a prospective purchaser to the property, quote him the price stipulated by the owner, notify the owner, and then sit back and wait for someone else to make the sale, feeling secure in the knowledge that his commissions are earned, regardless of who might consummate the sale." Id. at 477. Based on these and other authorities, it is clear that the evidence in this case does not support the jury's determination that Hart was the procuring cause of the sale of any of the Kraft lands. Accord, *Tidwell & Yarbrough Realty Co. v. Foster,* 123 Ga. App. 192 (2) (180 SE2d 259) (1971); *Fields Realty & Ins. Co. v. Smith,* 123 Ga. App. 342 (180 SE2d 909) (1971); *Parrish v. Ragsdale Realty Co.,* 135 Ga. App. 491 (3) (218 SE2d 164) (1975); *Fields Realty &c. Co. v. Teper,* 165 Ga. App. 28 (299 SE2d 74) (1983). Compare *Ideal Realty Co. v. Storch,* supra; *Spence v. Walker,* supra.

2. Even if there were evidence of any negotiations between Hart and his co-brokers on the one hand and Casey and his agents on the other, Hart's case would still fail for lack of evidence that Kraft had any knowledge of such negotiations. See generally *Booth v. Watson,* 153 Ga. App. 672 (266 SE2d 326) (1980); *Pate v. Milford A. Scott Real Estate Co.,* supra. We reject Hart's contention that the registration forms he submitted containing the names of Casey and Spear constituted sufficient notice to Kraft that negotiations were pending with these prospects. By his own admission, Hart had registered 70 or more names with Kraft by the time the sale contract was signed, yet neither Hart nor any of his co-brokers had ever communicated an actual offer to Kraft as of that time. Surely, Kraft cannot be expected to have acted under the assumption that Hart was actively negotiating with 70 or more persons.

3. For the above-stated reasons, we hold that the trial court erred in overruling Kraft's motions for directed verdict and for judgment notwithstanding the verdict. It is accordingly unnecessary

to address Kraft's remaining enumerations of error.
*Judgment reversed. Deen, P. J., and Carley, J., concur.*

DECIDED JANUARY 18, 1983 —
REHEARING DENIED FEBRUARY 7, 1983 —

*J. Kirk Quillian, Mary G. Diehl,* for appellants.
*John D. Jones, Steven J. Misner, J. W. Casey, William F. Spear, Forrest F. Long,* for appellees.