## A95A1182. CHRISTOPHER INVESTMENT PROPERTIES, INC. v. COX et al.

(465 SE2d 680)

JOHNSON, Judge.

The trial court granted summary judgment against Patricia Albert, the claimant of a real estate commission, finding that this agent of Christopher Investment Properties, Inc., d/b/a Re/Max, Northwest, was not the "procuring cause" of the sale in question and therefore was not entitled to receive any commission pursuant to the residential sale of "Whitehall." The court concluded that because Albert was not the procuring cause or a party to any valid contract to sell Whitehall, Albert's additional claims based on conspiracy and quantum meruit had no validity.

On March 23, 1991, Susan Perkins, a real estate agent working through Coldwell Banker Residential Real Estate, Inc., entered into an exclusive agency contract with Kenneth and Sally Cox to list Whitehall, their home, for sale at $1,850,000. Pursuant to the First Multiple Listing Services ("FMLS") agreement, the Coxes agreed to pay a real estate commission equal to eight percent of the sales price at the closing of the sale on Whitehall. FMLS published the information on Whitehall to notify all other real estate agents that the property was available for sale and that agents could earn a commission for its sale.

During mid-1991, Bill Dobbs, of the Georgia Department of Industry, Trade and Tourism, acting on behalf of Canadian resident Rudy Sagl, asked Albert to look for suitable upscale homes in the metropolitan Atlanta area. Albert prepared a notebook containing ex-

tensive information and pictures of numerous homes including Whitehall. Albert delivered the notebook to Dobbs who in turn provided it to appellee Sagl.

In November 1991, Albert personally showed Whitehall to Sagl and his wife. In early December 1991, Albert, on behalf of the Sagls, submitted a purchase offer for Whitehall. The Coxes rejected the Sagls' offer and made a counteroffer. After the Sagls' initial offer had been rejected, Albert again returned with the Sagls to Whitehall. In late December 1991, Albert discovered that Sagl and Cox wanted to meet to negotiate, and Albert contacted Perkins at Coldwell Banker to notify her. During the ensuing negotiations, Albert met Sagl and Cox at a hotel but at their request did not participate directly in the negotiations. Albert testified that the final purchase price mentioned during these negotiations was about $1,050,000. At some point, in late December 1991 or January 1992, negotiations on Whitehall stalled, and Albert did not actively participate in any further negotiations involving Whitehall.

From January 1992 through November 1992, Albert and her business partner continued to show homes to Sagl, his wife, other members of his family, and his agent, Jerry Florent. As late as mid-November 1992, Albert, through her partner, was still showing property to Sagl.

Without Albert's knowledge, on November 15, 1992, Sagl and Cox again talked about Sagl's possible purchase of Whitehall. During their negotiations, they discussed the issue of Albert's commission. Together they may have reached an understanding that if Albert could be cut out of the loop, Cox could reduce his selling price. According to Cox's testimony, Sagl told him Albert was in no way connected with him at this time and would not be involved in the sale at all. Cox obtained Perkins's agreement to reduce Coldwell Banker's commission from eight to four percent. Perkins drafted a contract to show Coldwell Banker as both the listing broker and the selling broker so that Coldwell Banker would receive the entire commission. When Albert discovered the pending sale, she immediately contacted Perkins and demanded her sales commission. She asserted a right to a commission because, "I presented the property to the purchasers, executed the first offer, stayed in constant contact with them, mentioned it to them repeatedly, never abandoned them. . . ." In light of Albert's claim for a commission, Perkins inserted Special Stipulation No. 4 into the final sales contract. This stipulation provides, "Purchaser and Seller agree that there should be one (1) commission paid by Seller to Coldwell Banker in the amount of four percent (4%) of sales price. If any other commission is claimed by any broker including Pat Albert, Re/Max Northwest, commission shall be paid by Purchaser." The Sagls purchased Whitehall for approximately $950,000

in December 1992. No commission was paid to Albert.

1. Re/Max, on behalf of Albert, contends there is a genuine issue of material fact regarding whether Albert was a procuring cause of the sale. Therefore, Re/Max asserts, the trial court erred in granting summary judgment to the appellees.

Albert's claim to an entitlement to a real estate commission is based on the exclusive listing agreement which provides for a four percent commission to the selling agent and a four percent commission to the listing agent. This listing was under FMLS. She testified she was seeking a commission as a selling agent. When a broker is unable to finalize a sale of property, a broker can attempt, nevertheless, to claim an entitlement to a sales commission for acting as the procuring cause of the sale. Generally, to qualify as the procuring cause a broker must establish that the negotiations still were pending between the prospective purchaser and the one seeking the commission and that the owner was aware that negotiations were still pending at the time the sale was consummated. *Pittard Machinery Co. v. Mitsubishi Intl. Corp.*, 192 Ga. App. 270, 271 (2) (384 SE2d 423) (1989). Merely locating a prospect and attempting to make a sale, without more, is generally insufficient to entitle an agent to a commission. *Foshee v. Harris*, 170 Ga. App. 394, 396 (317 SE2d 548) (1984).

Sagl cites *Parrish v. Ragsdale Realty Co.*, 135 Ga. App. 491 (218 SE2d 164) (1975), for the proposition that where negotiation is contemplated but not consummated and the parties in good faith break off negotiations, the broker is not entitled to a commission as a matter of law. But because the facts of *Parrish* are in such striking contrast to this case, *Parrish* is not controlling. Parrish showed a potential purchaser property which was bought nearly three years later without Parrish's involvement. Parrish brought suit for his commission. However, in the interim, Parrish had gone into the modular construction sales business working primarily out of state, did not actively work in the real estate business, was not physically present in Georgia except on weekends and did not have an office or telephone listing for his former real estate business. Id. Construing the evidence most favorably to the party opposing summary judgment, Albert constantly remained in touch with the Sagls, submitted a written contract on the Sagls' behalf, continued to attempt to interest the Sagls in the property and never abandoned her clients.

Similarly, we reject Sagl's argument that *Hendrix v. First Nat. Bank of Columbus*, 173 Ga. App. 513 (326 SE2d 489) (1985), controls. In *Hendrix*, we found summary judgment proper because there was no evidence in the record that Hendrix ever discussed or negotiated terms for the purchaser or conveyed an offer. Id. at 516. Here, there is evidence that Albert introduced Whitehall to the purchasers, presented a contract to the sellers on the purchasers' behalf and contin-

ued to try to persuade the Sagls to buy Whitehall after the initial negotiations floundered.

We also believe *Kraft Land Svcs. v. Hart Co.*, 165 Ga. App. 358 (1) (300 SE2d 186) (1983), is factually distinguishable. In *Kraft Land Svcs.*, the broker introduced the ultimate buyer to the land, gave the buyer information and repeatedly sought to interest the buyer; however, no negotiations ensued and no contract was offered. Id. at 363 (1). Here, unlike *Kraft Land Svcs.*, there were negotiations, a contract was offered and Albert maintains that she continued to attempt to effectuate the sale of Whitehall.

It is Re/Max's contention that there is evidence in the record to support Albert's claim that Cox interfered with her effort to earn a commission. Where a broker or agent can show that he was thwarted in his efforts to consummate a sale by the interference of the property owner, he need not make the showing required by *Pittard*, supra, and instead can "make out a prima facie case when he shows that negotiations for the sale were set on foot through his efforts, that he performed every service required by his employment which it was possible to perform, and that the failure on his part to personally consummate the [transaction] was due to the interference of the defendant." (Citation omitted.) *Tomlin v. Bickerstaff*, 85 Ga. App. 48, 51-52 (68 SE2d 224) (1951); *Kraft Land Svcs.*, supra. Although a broker does not establish he was the procuring cause by merely showing he first located the ultimate buyer, a broker can make out a case if he can show interference by the owner and that he did not abandon his efforts to effectuate the sale. *Crawley v. Sexton*, 207 Ga. App. 360, 364 (1) (427 SE2d 804) (1993).

Here, the record contains evidence which would permit a jury to find that the property owner, Cox, struck a deal with Sagl to exclude Albert from the negotiations to avoid having to pay Albert a sales commission.

Because we find there are genuine issues of material fact remaining to be resolved regarding whether Albert was the procuring cause in the Whitehall transaction, we reverse the trial court's grant of summary judgment in favor of the appellees.

2. The trial court concluded that unless Albert was the procuring cause of the sale of Whitehall, she could not recover under quantum meruit or conspiracy theories. As to the conspiracy claim, it follows that if the jury determines that Albert was the procuring cause of the sale of Whitehall, then the jury could also find there had been a conspiracy to deprive her of a commission. See *Hendrix*, supra at 515. On the other hand, if the jury decides Albert was not the procuring cause of the sale of Whitehall, then her claim of conspiracy must fail as a matter of law since an entitlement to a commission is a necessary element of her conspiracy claim. See *Fields Realty &c. Co. v. Teper*, 165

Ga. App. 28, 30 (2) (299 SE2d 74) (1983).

As to the quantum meruit claim, Sagl contends it is well settled that if a real estate agent fails to prevail on a procuring cause claim, then a claim for quantum meruit always must necessarily fall. We disagree. In *Booth v. Watson*, 153 Ga. App. 672 (266 SE2d 326) (1980), we upheld summary judgment on the quantum meruit claim, not because of an adverse determination of the procuring cause issue, but because the only "service" Booth rendered was a single telephone call and a follow-up letter. Id. at 677 (2). Similarly, in *Income Properties v. Glass*, 195 Ga. App. 127 (392 SE2d 728) (1990), we affirmed summary judgment on the quantum meruit claim, but we did so because factually the appellants were unable to make a threshold showing of services rendered and accepted. Specifically, they failed to show that there was an exclusive listing, or that any offer was made or that any negotiations ever took place between the broker and the purchaser. Id. at 129 (1).

Moreover, we have previously held that an agent could have a quantum meruit claim despite not being the procuring cause of the sale. *Sharp-Boylston Co. v. Lundeen*, 145 Ga. App. 672, 674 (244 SE2d 622) (1978). In *Sharp-Boylston*, we noted the rendering of services valuable to another, which the latter accepted, created an implied promise to pay the reasonable value thereof. We reached a similar result in *Futch v. Guthrie*, 176 Ga. App. 672, 673 (1) (337 SE2d 384) (1985), where we upheld the jury's verdict in favor of two brokers for payment of their services on their quantum meruit claim even though they were not determined to have been the procuring cause of the sale.

Finally, we reach Albert's claim for punitive damages. Whether a defendant's actions are wilful, wanton or malicious so as to sustain a claim for punitive damages is ordinarily an issue for consideration by a jury. See *Moon v. Ga. Power Co.*, 127 Ga. App. 524, 527 (2) (194 SE2d 348) (1972). In a case alleging punitive damages in connection with a civil conspiracy claim, this court held that the imposition of punitive damages was an issue properly reserved for jury consideration. *Sikes v. Foster*, 74 Ga. App. 350, 355 (39 SE2d 585) (1946), rev'd on other grounds, *Foster v. Sikes*, 202 Ga. 122 (42 SE2d 441) (1947).

For these reasons, we also reverse summary judgment as to the remainder of Re/Max's claims finding there are material issues of fact remaining to be resolved.

*Judgment reversed. Birdsong, P. J., and Smith, J., concur.*

Decided August 25, 1995 —
Reconsiderations denied December 12, 1995 —

*Palmer & Berman, Jeffrey N. Berman*, for appellant.

*Kidd & Vaughan, David N. Schaeffer, King & Croft, F. Carlton King, Jr., Thomas A. Croft, Cohen, Pollock & Merlin, Martin M. Pollock*, for appellees.

*Anne E. Merony*, amicus curiae.