A95A2503. ATLANTA APARTMENT INVESTMENTS, INC. et al.
v. NEW YORK LIFE INSURANCE COMPANY et al.
(469 SE2d 831)

McMURRAY, Presiding Judge.

Plaintiffs Atlanta Apartment Investments, Inc. ("AAI") and W. Barton George, Jr. brought this action for a real estate sales commission and damages allegedly owed by defendants New York Life Insurance Company ("New York Life"), Hunter's Landing Apartments Limited Partnership ("Hunter's Landing L.P."), and Hunter's Title Company, Inc. d/b/a Hunter's Landing Apartments Co-Venture for the sale of an apartment complex ("the Co-Venture"). Counts 1 and 2 are asserted against New York Life under breach of contract or quantum meruit. Count 3 alleges the Co-Venture tortiously interfered with plaintiffs' business relations. Count 4 alleges New York Life and the Co-Venture cooperated to deprive plaintiffs of the commission, acting in bad faith and being stubbornly litigious.

According to the amended complaint, AAI is a Georgia commercial real estate broker licensed by the State of Georgia and W. Barton George, Jr., is an employee of AAI, licensed to sell real estate in Georgia. In June 1991, defendant New York Life allegedly "permitted plaintiffs to serve as real estate brokers in the sale of certain real property in Gwinnett County known as Hunters Landing Apartments[; that plaintiffs admittedly] did not have an exclusive contract to sell the property[; but that on] June 18, 1991, . . . New York Life (through Sam Conley, an assistant to New York Life's real estate vice president, Michael Towner) authorized plaintiffs to procure a purchaser. . . ." Viewed in the light most favorable to plaintiffs, the evidence would authorize the following chronology: W. Barton George, Jr. knew that the previous owner of Hunter's Landing Apartments had let the property go "into receivership . . . [from which circumstance] people in the brokerage community know that there may be a change in ownership, there may be an opportunity for them[.]" W. Barton George, Jr. affirmed that, being "an aggressive broker, [AAI, through himself,] started trying to figure out how [he] could make a deal out of that opportunity[.]" In the spring and early summer of 1991, plaintiff AAI originally tried, without success, to "put together something for its own account to buy . . ." the property. The principals of AAI "felt like the price that New York Life wanted for those apartments was a little higher than maybe they were worth at that time in the market[.]" AAI "decided to see if Strand [were] interested in buying Hunter's Landing[.]" In mid-May 1991, W. Barton George,

Jr. showed Strand representative John Cassils three or four "apartment properties that were imminent foreclosure properties, properties that were in trouble and it was anticipated would soon be REO [(Real Estate Owned)]." On May 29, 1991, W. Barton George, Jr. showed the Hunter's Landing Apartments to James A. Johnston, a vice president of Strand Properties Corporation ("Strand"). On or about June 10, 1991, W. Barton George, Jr. spoke with Sam Conley of New York Life, who related "that the property currently had an NOI of $1,050,000 and that it was 96 percent leased, and the NOI was arrived at by the operating expenses of $2400 a unit." At that time, W. Barton George, Jr. "explained to [Sam Conley] that I work with a group who bought for their own account and served as third-party brokers and I would be interested in receiving information. [Sam Conley] told [W. Barton George, Jr.] that in order to release information that he would need a letter and market areas we were interested in." W. Barton George, Jr. responded with a letter dated June 11, 1991, in which he introduced AAI as an entity that "own[ed] and operate[d] over 2,000 apartment units in Atlanta, [with] plans to acquire an additional 1,000 units before year end." AAI expressed an interest in seeing any foreclosed apartment developments that New York Life might wish to sell, "preferably before you list the properties with a real estate broker." AAI expressed "a very sincere interest in . . . Hunter's Landing . . . and, would in short, like to own the real estate." This letter closed with the request to be informed of New York Life's future "plans for the property once you have some direction."

On June 26, 1991, plaintiffs allegedly introduced New York Life to the "Strand Properties Corporation, a real estate company operating out of Vancouver, British Columbia." Strand authorized plaintiffs to submit an offer, and on July 8, 1991, "plaintiffs submitted Strand's offer to purchase the property for $12,000,000 to New York Life." This $12,000,000 figure was derived "when [W. Barton George, Jr.] drove Jim [Johnston, of Strand,] to the apartment property itself[.] [Jim Johnston] asked [W. Barton George, Jr.] for [his] opinion as to what the property would be worth in [the current commercial real estate] market. . . . And [W. Barton George, Jr.] told [Jim Johnston] that [he] felt like the property was worth $12,000,000." The formal $12,000,000 offer consisted of "$2,400,000 to be paid in cash at closing including all deposit monies; . . . [and] a first mortgage . . . in the amount of $9,600,000 to be provided by [New York Life as] the Seller. The First Mortgage shall be on a non-recourse basis and be [payable] interest only with a 10 year term at an interest rate of 8 % in the first year, 8½ % in the second year, 9 % in the third year, and 9½ % thereafter." This offer further specified "Seller and Purchaser agree that Seller shall be responsible for all brokerage commissions payable including a sales commission to [plaintiff, AAI]." By its terms, the

offer "shall automatically expire, unless accepted in writing by Seller no later than 5:00 p.m. on July 8th, 1991."

Plaintiff W. Barton George, Jr. submitted this offer to defendant New York Life under a cover letter on AAI stationery, addressed to Michael Towner, a vice president of New York Life. This cover letter makes no reference to any listing agreement whereby defendant New York Life consented to having plaintiff AAI or plaintiff W. Barton George, Jr., act as a seller's real estate agent on behalf of New York Life. On July 11, 1991, Michael W. Towner, real estate vice president for New York Life, replied to plaintiff W. Barton George, Jr. and rejected Strand's offer, advising that New York Life had "received and declined several proposals at [the] price range [offered by Strand]." The present asking price was "$14.5 million but we are only beginning to market this property and this figure is subject to change." This letter does not confirm or ratify any listing agreement among defendant New York Life on the one hand and plaintiffs AAI and W. Barton George, Jr. on the other. Rather, it closes with the formal "appreciat[ion of plaintiffs'] interest and efforts and [urges plaintiffs to] feel free to call me to discuss the matter further." Plaintiff W. Barton George, Jr. does not "recall discussing a commission arrangement with [either Michael Towner or Sam Conley]." But Sam Conley made it absolutely clear to W. Barton George, Jr. "that New York Life was not a distress seller. They were not going to sell real estate on a distress basis. They were far too patient and well capitalized to sell in a bargain basement type situation." William Butler, the 90 percent shareholder in AAI, affirmed that, after this exchange of letters, "[negotiations] broke off, but [AAI was] aware that Jim [Johnston of Strand] kept in contact with New York Life[.]"

Plaintiffs further alleged that Michael Towner's July 11, 1991, letter was a counteroffer, which plaintiffs conveyed to Strand. The $2,500,000 difference between Strand's offer and New York Life's asking price suggested to W. Barton George, Jr. "that there was very little opportunity to make a deal." Although Sam Conley also recognized that $12,000,000 represented the property's fair market value under then-prevailing conditions, nevertheless, New York Life "felt like the units that were overbuilt in the '80s would be absorbed, there was positive growth there [in Gwinnett County, Georgia], that rents would move and that in time the market would come to them, and they were very comfortable with that stance, and they were prepared to wait for the market to come to them." Consequently, it came as no surprise to W. Barton George, Jr. "that negotiations for this Hunter's Landing property were dropped in July of 1991, given where New York Life was and where Strand was[.]" Still, "Strand asked plaintiffs to continue to work with New York Life to see if Strand could purchase the property at a later date." That is, plaintiffs were re-

quested by Jim Johnston of Strand to "track the deal."

In September 1991, plaintiffs were informed by Sam Conley of New York Life that "the sale of Hunters Landing Apartments was on hold for the near future." As W. Barton George, Jr. understood the situation, New York Life "determined internally that the property was not going to bring the price that they wanted in the current market situation, and they were going to push the rents and consider remarketing the property in the middle of 1992." Plaintiffs allegedly "continued negotiations with Strand and acted as intermediary between the seller and the purchaser." The evidence of this is that W. Barton George, Jr. tried to "compile resume information to accompany an[other] offer from Strand on Hunter's Landing, which [he] was led to believe would be forthcoming." However, W. Barton George, Jr. "would have asked them[, i.e., Strand officers,] to put that together for me[, . . . because he] couldn't create that [him]self[.]" At the behest of Strand, W. Barton George, Jr. also telephoned "Mr. Conley numerous times for the next month in an attempt to get [a marketing package on the property], and finally on our last conversation, he indicated that they [New York Life] were not going to provide marketing packages[.]"

During the next two years, W. Barton George, Jr. "would be introduced to people who would indicate an interest in buying suburban garden apartment complexes in the nine-and-a-half cap[italization] range. And from time to time [he] would call Mr. Conley, Mr. Towner, whoever [he] could reach, to see if the operating performance or the economics of this property had reached such a level, and they never had. So, [during that time], the property was never presented to another buyer, although [W. Barton George, Jr.] certainly explored the possibility with the owner to see if there may be a fit there, but . . . no formal package, no information was ever sent to anyone else[.]" W. Barton George, Jr. affirmed his understanding that "if the property [were] off the market, that not only the deal with Strand . . . had been . . . dropped but any prospective deal was, at least for the time being, dead at that point[.]" W. Barton George, Jr. also "called Mr. Conley to see if [New York Life] might have other real estate holdings that they would be interested in selling at this point in time." He further affirmed that, from September 4, 1991, until May 20, 1992, he "did not have any conversations with New York Life[.]" On May 20, 1992, Sam Conley informed W. Barton George, Jr. that the "price remained at $14.5 million and that the sales price at this level would reflect a seven-and-a-half percent cap on their current income. That was not consistent with [another prospect's] buying parameters, and it was dropped."

On April 28, 1993, W. Barton George, Jr. again queried about the sales price of the property, on behalf of a third prospect. Michael W.

Towner informed plaintiffs that the "asking price of $14,500,000 was still firm and New York Life would . . . provide 75% financing at market rates." "Unknown to plaintiffs, in May of 1993, Jim Johnston of Strand bypassed plaintiffs and started dealing directly with New York Life in an attempt to purchase the property without any payment of a brokerage commission." On December 16, 1993, defendant Co-Venture, an entity allegedly "affiliated with Strand," purchased the property for $14,500,000 with New York Life financing $10,875,000 or 75 percent of the purchase price. Contending that they were the procuring cause of a ready, willing, and able purchaser, plaintiffs demanded a three percent commission, approximately $435,000.

Defendants answered, denying the material allegations, while admitting that New York Life rejected Strand's July 8, 1991, offer of $12,000,000, and further admitting that on December 16, 1993, New York Life sold the property to the Co-Venture on the terms as alleged, without paying plaintiffs a real estate broker's commission. After discovery, defendants Hunter's Landing Apartments L.P. and the Co-Venture jointly moved for summary judgment contending inter alia that plaintiff W. Barton George, Jr. had no standing to bring a direct action for a real estate broker's commission; that AAI was not the procuring cause of the eventual sale to the Co-Venture; and that the Co-Venture, as a party to the transaction, had not tortiously interfered with plaintiffs' business relations. New York Life also moved for summary judgment, contending that plaintiffs were not the procuring cause of the sale and also on the ground that W. Barton George, Jr. had no standing to pursue real estate commissions. The trial court granted summary judgment to all defendants, and this appeal followed. *Held*:

1. There is no written listing agreement between AAI and New York Life, nor do plaintiffs rely on any oral agreement whereby defendant New York Life expressly agreed to retain AAI as its agent to procure a buyer for the property. Rather, plaintiffs contend there was an implied agreement to pay AAI a brokers' commission.

OCGA § 9-2-7 provides in part: "Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." A real estate broker may bring a claim for commissions based upon "an implied obligation to pay where [the broker's] services have been rendered and accepted by the beneficiary thereof, provided however, said services were not unlawful in that the broker was not licensed in accordance with [Chapter 84-14 of former Code Annotated, now OCGA § 43-40-1 et seq.]. See Code § 3-107 [now OCGA § 9-2-7]; [cits.]" *D. L. Stokes & Co. v. McCoy*, 212 Ga. 78 (2) (90 SE2d 404). "[A] broker doing business in Georgia without the re-

quired license ha[s] no standing to sue [for commissions allegedly owed]." *Mathews v. Greiner*, 130 Ga. App. 817, 818-819 (1) (204 SE2d 749). In the case sub judice, it is undisputed that only AAI is authorized to act as a real estate broker in Georgia and that plaintiff W. Barton George, Jr. is not so licensed. Rather, he is authorized only to act as a real estate agent. In Georgia, "[i]t [is] a condition precedent to recovery that the plaintiff prove he had the necessary license. . . ." *Beets v. Padgett*, 123 Ga. App. 68 (1) (179 SE2d 560). "The right in Georgia to 'enforce in any court' a claim 'for commissions . . . or fees for any business done as real estate broker' is denied to any person who acts 'without having previously obtained the license required . . .' Code [Ann.] § 84-1413 [as amended, now OCGA § 43-40-30]. This would apply even if the claim were on a quantum meruit basis. [Cit.]" *Dixon v. Rollins*, 120 Ga. App. 557, 558 (1), 559 (171 SE2d 646). See also *Padgett v. Silver Lake Park Corp.*, 168 Ga. 759 (149 SE 180). Consequently, the trial court in the case sub judice correctly granted summary judgment against W. Barton George, Jr. individually, as to all claims in contract as well as for tortious interference with AAI's business relations.

2. Plaintiff AAI contends the trial court erred in granting summary judgment as to its claim in quantum meruit, arguing that jury questions remain as to whether it was the procuring cause of the sale. We disagree.

"Finding the prospect and attempting to make the sale are not sufficient, in law, to entitle an agent to a commission; to earn the commission, he must be the procuring cause of the sale. *Jordan v. Dolvin Realty Co.*, 54 Ga. App. 472 (188 SE 304) (1936)." *Foshee v. Harris*, 170 Ga. App. 394, 396 (317 SE2d 548). "A broker . . . does not make out a case of procuring cause . . . by merely showing that he first located the ultimate purchaser, if it further appears that without interference by the owner he was unsuccessful in bringing about an offer which could be consummated, and that the sale was made after he had abandoned his effort. *Jordan v. Dolvin Realty Co.*, 54 Ga. App. 472, 477[, supra]; *Landrum v. Lipscomb-Ellis Co.*, 62 Ga. App. 649 (9 SE2d 205); *Crutchfield v. Western Elec. Co.*, 66 Ga. App. 161 (17 SE2d 246)." *Tidwell & Yarbrough Realty Co. v. Foster*, 123 Ga. App. 192, 193 (2) (180 SE2d 259). "Because one puts property in the hands of brokers to sell, it does not follow that he himself cannot sell. If he does not use their labor to help him, he owes them nothing; if he does use it, and puts in to take the trade — its consummation — out of their hands so as to escape paying them, then *ex equo et bono*, he does owe them, and must pay just what they could have made by the contract if he had not prevented it. This is sound sense and good law[.]" *Doonan v. Ives & Krouse*, 73 Ga. 295, 302 (3) (1885).

As can be seen by reference to the record, plaintiffs' efforts in the

case sub judice amounted to presenting a single offer that was rejected, and then spending the next two years asking the alleged principal if its asking price remained firm at $14,500,000. This simply is not any evidence that plaintiffs performed valuable services which were accepted by the principal, such that the law should impose an equitable obligation to pay real estate broker's commissions. The authorities cited by plaintiff AAI to show a jury question as to a broker's claim in quantum meruit are distinguishable since it appears in every instance cited there was an underlying express listing agreement. See *Christopher Investment Props. v. Cox*, 219 Ga. App. 440 (465 SE2d 680) (where a seller entered into an exclusive first multiple listing services agreement which "notif[ied] all other real estate agents that the property was available for sale and that agents could earn a commission for its sale"); and *Sharp-Boylston Co. v. Lundeen*, 145 Ga. App. 672 (244 SE2d 622) (Lundeen orally "asked [his broker son-in-law] to locate a building to house a printing brokerage business which he [Lundeen] intended to open soon"); and *Martin v. Hendrix, Waddell &c. Co.*, 140 Ga. App. 557, 558 (231 SE2d 526) (where an "oral listing was obtained . . ."). See also *Galloway v. McKinley*, 73 Ga. App. 381, 383 (2) (36 SE2d 485), interpreting Code Ann. § 4-213, now OCGA § 10-6-32, and holding that "the statute and the decisions [of the Supreme Court and this Court] presuppose the existence of an agency between the real-estate broker and the property owner before the broker can collect a commission." In the case sub judice, the record is devoid of evidence that plaintiffs' efforts were the procuring cause of the eventual sale of the property by the owner at its initial asking price of $14,500,000. The trial court correctly granted summary judgment as to plaintiff AAI's claim in quantum meruit.

3. It follows that the trial court further correctly granted summary judgment as to Count 3 of the complaint. This alleged that the Co-Venture intentionally interfered with AAI's business relations and "induced New York Life not to pay plaintiffs the real estate commission due. . . ."

"Where no commissions are due, a claimed conspiracy to defraud the broker of the commissions does not create a claim for relief. [Cits.]" *Martin v. Hendrix, Waddell &c. Co.*, 140 Ga. App. 557, 561 (4), supra. "Not only was there no evidence of any conspiracy [in the case sub judice], there could have been none to deprive [AAI] of [its] commission since under the facts and law [AAI] was not the procuring cause of the sale and therefore not entitled to the commission. See *Woodall v. McEachern*, 113 Ga. App. 213 (147 SE2d 659)." *Parrish v. Ragsdale Realty Co.*, 135 Ga. App. 491, 495 (6) (218 SE2d 164).

*Judgment affirmed. Andrews, J., concurs. Blackburn, J., concurs in the judgment only.*

*Schreeder, Wheeler & Flint, David H. Flint, Lynn C. Stewart,* for appellants.

*Alston & Bird, Jay D. Bennett, Candace N. Smith, Morris, Manning & Martin, Warren W. Wills, Jr., Ann R. Schildhammer,* for appellees.